# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 04-1826

United States Fidelity & Guarantee Insurance Company; Catherine L. Rootness, Trustee for the Heirs and Next of Kin of Brent A. Hincher, deceased; Payless Cashways, Inc., d/b/a/ Knox Lumber Company,

Appellants,

v.

Commercial Union Midwest Insurance Company; American Employers' Insurance Company,

Appellees.

Appeal from the United States District Court for the District of Minnesota.

[PUBLISHED]

Submitted: March 18, 2005
Filed: December 7, 2005

Before MURPHY, HANSEN, and SMITH, Circuit Judges.

HANSEN, Circuit Judge.

This case involves a dispute between insurance companies over whose policy covers Payless Cashways, Inc.'s (Payless) liability related to the tragic death of Brent A. Hincher, who was killed during a work accident on Payless's premises. The district

SCANNED
JAN 04 2006
U.S. DISTRICT COURT MPLS

court granted summary judgment to Commercial Union Midwest Insurance Company (CU) and American Employers' Insurance Company (AE), finding that Payless was not insured under AE's policy and that CU's policy provided only excess insurance after United States Fidelity and Guarantee Insurance Company's (USF&G) primary coverage was exhausted. The plaintiffs appeal the district court's judgment granting summary judgment to CU, and we reverse and remand for further proceedings.[1]

I.

Payless contracted with KamCo Inc. to install lighting displays and to perform re-merchandising work at Payless's stores, including one in Newport, Minnesota. The late Mr. Hincher worked for KamCo and was performing re-merchandising work in Payless's Newport store when a display fell, killing him. Catherine L. Rootness, Hincher's widow and trustee for the heirs and next of kin of Hincher, commenced a wrongful death action on behalf of Hincher's estate against Payless in 1998. Payless filed a third-party claim against KamCo, asserting that KamCo was liable under the Payless-KamCo re-merchandising contract to defend and indemnify Payless for any liability related to the accident. KamCo had a commercial general liability (CGL) policy with AE and an umbrella policy with CU. Payless carried its own excess liability policy with USF&G.

Payless and KamCo disagreed about whether their contract included an indemnity agreement, the terms of which were contained in an unsigned Supplementary Terms and Conditions Agreement (Supplementary Agreement). In addition to the indemnity provisions, the Supplementary Agreement required KamCo to provide and maintain $2 million worth of CGL insurance and to name Payless as an additional insured. In June 1999, Payless and KamCo entered into a stipulation,

[1]The appellants do not appeal the district court's ruling that Payless was not insured under AE's policy.

in which they agreed to allow the district court to determine whether their agreement included the Supplementary Agreement. The court ultimately found that the Supplementary Agreement was part of the contract between Payless and KamCo. Payless agreed in the stipulation to waive its claim against KamCo for Payless's defense costs in the underlying wrongful death suit. The parties also agreed that KamCo was obligated to indemnify Payless under the indemnity agreement only for fault attributable to KamCo; KamCo was not obligated to indemnify Payless for Payless's own negligence.

After the court determined that the Supplementary Agreement was part of the re-merchandising contract, Payless's insurer, USF&G, tendered Payless's defense of the wrongful death lawsuit to KamCo's insurers, CU and AE, pursuant to Payless's status as an additional insured under KamCo's CGL policies. Both insurers refused the tender. Rootness settled the claim with KamCo, whereby AE paid $500,000 to Rootness on KamCo's behalf under the CGL policy that AE had issued to KamCo.

The case proceeded to trial where a jury awarded total damages of $1.2 million, apportioning fault as follows: 22% to KamCo, 60% to Payless, and 18% to the decedent, Mr. Hincher. Rootness received a judgment against Payless for $720,000 based on Payless's 60% share of the fault. During Rootness's appeal of the jury verdict to this court, Rootness settled the claims with Payless and its insurer, USF&G, for $950,000, which was paid as $750,000 in cash from USF&G and $200,000[2] in Payless stock. CU and AE refused to participate in the settlement negotiations on Payless's behalf or contribute toward the settlement.

---

[2]As discussed in more detail <u>infra</u>, Payless had a $350,000 self-insured retention (SIR) under the USF&G policy, obligating Payless to cover the first $350,000 of any claim under the policy. Payless filed for bankruptcy protection during the pendency of this case, and the bankruptcy court apportioned $200,000 of the $350,000 SIR toward this litigation, with the remaining SIR apportioned to another employee injured in the same incident.

Following the settlement, Rootness, Payless, and USF&G commenced this action to recover the amounts paid by or on behalf of Payless, as well as the defense costs, from CU and AE.[3] The parties filed cross motions for summary judgment, and the district court granted summary judgment to AE and CU. The district court found that Payless was not insured under AE's policy because, even though KamCo was contractually obligated to add Payless as an additional insured under its CGL policies, KamCo had failed to notify AE and pay the required $50 premium for adding additional insureds to AE's policy.

CU's policy definition of additional insureds was broader than AE's policy, extending insured status to "any person or organization with whom or with which [KamCo] ha[d] agreed in writing prior to any loss, 'occurrence' or 'offense' to provide insurance such as is afforded by this policy, but only with respect to [KamCo's] operations or facilities [KamCo] own[ed] or use[d]." (Appellants' App. at 172, Section II.) The policy defined an "insured" as "any person or organization qualifying as such under SECTION II–WHO IS AN INSURED." (Id. at 175.) For purposes of summary judgment, CU agreed that Payless was an additional insured under this provision of CU's policy. The district court determined that CU and USF&G both provided excess insurance, that their "other insurance" provisions conflicted, and that USF&G's policy should provide primary coverage as it was closer to the risk. In the district court's view, because USF&G's policy limits exceeded the $750,000 it had paid to the estate, CU's "secondary" excess coverage was never triggered. The district court also concluded that Payless was self-insured to the extent of the $200,000 SIR in the USF&G policy and that the self-insurance was "other insurance" that was primary to CU's excess coverage, such that CU was not liable for the first $200,000 of liability not covered by the USF&G policy. Finally, the district court found that

[3]The lawsuit initially named KamCo as a defendant on the theory that KamCo breached its contractual duty to name Payless as an additional insured on the AE policy. Those claims were resolved, and KamCo was released from the case prior to the district court's ruling on the motions for summary judgment.

CU was not obligated to pay the defense fees for either the underlying wrongful death lawsuit or the current lawsuit. The plaintiffs appeal the district court's ruling to the extent that it dismissed their claims against CU.

II.

We review the district court's grant of summary judgment de novo. Summary judgment is appropriate if there are no genuine issues of material fact to be decided, and the moving party is entitled to judgment as a matter of law. Dowdle v. Nat'l Life Ins. Co., 407 F.3d 967, 970 (8th Cir. 2005); Fed. R. Civ. P. 56(c). The parties agree that Minnesota law applies to this diversity action. The interpretation of insurance policies is a legal issue for the court to determine. Dowdle, 407 F.3d at 970.

The parties agree that Payless is insured under CU's policy as an additional insured. The CU and the USF&G policies both provide coverage for Payless's own liability resulting from Mr. Hincher's accident. When two policies provide coverage for the same incident, the question of which policy provides primary coverage is a legal determination that we make by looking to the language of the policies at issue. See Christensen v. Milbank Ins. Co., 658 N.W.2d 580, 587 (Minn. 2003). Minnesota courts determine the order of coverage by looking to the priority rules contained in each policy, generally found in the policies' "other insurance" provisions. See N. Star Mut. Ins. Co. v. Midwest Family Mut. Ins. Co., 634 N.W.2d 216, 222 (Minn. Ct. App. 2001). If the "other insurance" clauses contained in the applicable policies conflict, then the court looks beyond the language of the policies and assigns primary coverage to the policy that more closely contemplated the risk. Christensen, 658 N.W.2d at 587. Where the policies equally contemplate the risk, Minnesota courts pro rate the loss among the applicable policies. See Cargill, Inc. v. Commercial Union Ins. Co., 889 F.2d 174, 179-80 (8th Cir. 1989) (applying Minnesota law and apportioning liability based on the proportion that each insurer's policy limit bears to the total available insurance limits).

The district court first determined that the "other insurance" clauses conflicted, and then went on to determine that USF&G's policy was closer to the risk of loss stemming from Mr. Hincher's death. The CU policy contained an "other insurance" clause which provided in part: "If there is other insurance, other than as provided above, which applies to the loss, we pay only for the excess of the amount due from such other insurance, whether collectible or not." (Appellants' App. at 180.) USF&G's policy likewise contained an "other insurance" clause that provided: "This insurance is excess over other insurance whether primary, excess, contingent or on any other basis, except other such insurance purchased specifically to apply in excess of this insurance." (Id. at 208.) "Other insurance" provisions contained in two different policies conflict if "'the apportionment among the companies cannot be made without violating the other insurance clause of at least one company.'" Christensen, 658 N.W.2d at 587 (quoting Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co., 239 N.W.2d 445, 446 (Minn. 1976)). The clauses at issue here conflict as both policies purport to provide excess coverage where another policy applies to the loss, and application of each policy's "other insurance" provision would preclude coverage by either. See N. Star Mut. Ins. Co., 634 N.W.2d at 222 ("Because each policy's 'other insurance' clause provided for coverage only after all other applicable insurance coverage was exhausted, the clauses conflict."). We, like the district court, proceed to determine which policy more closely contemplated the risk.

Minnesota courts apply two different tests in apportioning liability between insurers when the other insurance clauses conflict: the "total policy insuring intent" analysis or the "closer to the risk" analysis. The "total policy insuring intent" analysis is a broader test and "examines the primary policy risks upon which each policy's premiums were based and the primary function of each policy." CPT Corp. v. St. Paul Fire & Marine Ins. Co., 515 N.W.2d 747, 751 (Minn. Ct. App. 1994). In assessing which policy is closer to a given risk, Minnesota courts consider three specific questions:

> (1) Which policy specifically described the accident-causing instrumentality? (2) Which premium is reflective of the greater contemplated exposure? (3) Does one policy contemplate the risk and use [of] the accident-causing instrumentality with greater specificity than the other policy–that is, is coverage of the risk primary in one policy and incidental to the other?

Ed Kraemer & Sons, Inc. v. Transit Cas. Co., 402 N.W.2d 216, 222 (Minn. Ct. App. 1987) (internal marks omitted). The tests are similar, though application of the total policy insuring intent analysis is less mechanical than the closer to the risk analysis.

The district court found that USF&G's policy was closer to the risk primarily because Payless paid a premium to USF&G specifically to cover Payless's negligence, whereas CU received no additional premium to cover Payless's negligence. The district court also made much of the fact that the liability at issue was solely that of Payless as determined by the jury's apportionment of 60% of the fault to Payless, and the parties agreed that KamCo was obligated to indemnify Payless under the Supplementary Agreement only for any fault attributed to KamCo. We respectfully believe the district court erroneously relied on these facts in applying the closer to the risk analysis.

Although KamCo's liability under the indemnity agreement was limited to the fault attributable to KamCo, CU's insurance policy does not so limit CU's policy's coverage of Payless. The CU policy covers "any . . . organization with . . . which [KamCo] ha[s] agreed in writing . . . to provide insurance such as is afforded by this [CU] policy, but only with respect to [KamCo's] operations." (Appellants' App. at 172.) Minnesota courts have held in similar circumstances that as long as there is a but-for causation between the loss and the named insured's operations, the "additional insured" coverage provides coverage for the additional insured's own liability, irrespective of any limitations of liability between the named insured and the additional insured. See Andrew L. Youngquist, Inc. v. Cincinnati Ins. Co., 625 N.W.2d 178, 183-84 (Minn. Ct. App. 2001). The loss at issue here clearly has a but-

for connection to KamCo's operations; Mr. Hincher, a KamCo employee, would not have been killed on Payless's premises if KamCo had not been performing its obligations under the contract. Having satisfied the contingencies of the policy, CU's policy provides coverage for Payless's liability arising from its own fault regardless of KamCo's indemnity agreement. The district court erred in relying on the allocation of fault by the jury because "[t]he closeness to the risk test is separate from any dispute among defendants as to whose actions negligently contributed to the accident." See Ed Kraemer & Sons, Inc., 402 N.W.2d at 222 (reversing district court's allocation of the risk and noting that it was "disturbed by this focus on Kraemer's potential negligence").

Considering the closer to the risk analysis, we find the test to be of little guidance. Neither policy specifically describes the accident-causing instrumentality, in this case, the display being installed at Payless's store. USF&G's policy is an "excess general liability" policy and provides that it "will pay 'ultimate net loss' . . . because of 'bodily injury' . . . to which this insurance applies caused by an 'occurrence' that takes place in the 'coverage territory.'" (Appellants' App. at 189.) "Ultimate net loss" is defined as "those sums that the insured [Payless] becomes legally obligated to pay as damages." (Id. at 200.) As it is titled, the USF&G policy provides excess general liability coverage to Payless for its "Building Supplies" business. (Id. at 188.) The loss at issue occurred in the course of Payless's business of "Building Supplies" to the extent that Payless was changing the display of those building supplies.

CU's policy is equally general. CU agreed to "pay those sums that the 'insured' becomes legally obligated to pay as damages . . . because of 'bodily injury' . . . to which this insurance applies." (Id. at 168.) Thus, the CU policy covers those sums that Payless becomes legally obligated to pay because of bodily injury. The insurance applies to Payless as an "additional insured," "but only with respect to [KamCo's] operations" (id. at 172), which include hanging display services (id. at 166). The loss

at issue here was incurred with respect to KamCo's operations of hanging displays. Thus, the risk was also contemplated by CU's policy, but not with any specificity.

Although KamCo paid a flat-rate premium for CU's coverage, the policy clearly contemplated that CU would be providing coverage to other entities with which KamCo contracted to provide coverage as additional insureds without requiring an additional premium to cover the additional insured. The Supreme Court of Minnesota has noted the "long-standing practice in the construction industry by which the parties to a subcontract . . . agree that one party would protect 'others' involved in the performance of the construction project." Holmes v. Watson-Forsberg Co., 488 N.W.2d 473, 475 (Minn. 1992) (explaining the Minnesota legislature's actions in prohibiting indemnity agreements in construction contracts that indemnify a party from its own negligence, Minn. Stat. § 337.02, but allowing one party to provide insurance that covers the other party's negligence, Minn. Stat. § 337.05). That CU did not charge an additional premium to add additional insureds under its policy does not change the clear import of its policy that provides coverage to additional insureds. Presumably, CU considered the risk posed by including additional insureds within its policy coverage when it set its rate and issued the policy at the flat-rate premium. Cf. Presley Homes, Inc. v. Am. States Ins. Co., 108 Cal. Rptr. 2d 686, 691 (Cal. Ct. App. 2001) ("If, as defendant asserts, it simply provided the additional insured endorsements without increasing the amount of the subcontractors' premiums, that still would not affect a covered party's reliance on the policies' language and the nature of the activity covered by them.").

Although Payless paid a much larger premium for its policy with USF&G ($614,000) than KamCo paid for its policy with CU ($3,736), those are the total premiums paid for two policies that covered widely divergent risks. Neither policy required or stated a premium specifically for the loss at issue here. KamCo's premium was a one-year flat-rate premium, and its coverage explicitly contemplated "additional insureds" similar to Payless for risks stemming from KamCo's operations. Payless's

premium was based on a percentage of Payless's receipts over a two-year period, which were estimated at $5.2 billion dollars, and appeared to cover all of Payless's stores throughout the country. Thus, the premium sizes do not reflect that USF&G contemplated the specific risk of Mr. Hincher's death, an employee of a subcontractor installing displays at one of Payless's stores, any more than CU's policy contemplated that risk, which involved an employee of CU's named insured injured in the course of the named insured's business. The third factor of the closer to the risk test adds little to our analysis, as neither policy specifically contemplated the risk or the instrumentality at issue here, so neither one can be said to have provided primary rather than incidental coverage for the loss. Cf. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Republic Underwriters Ins. Co., 429 N.W.2d 695, 697 (Minn. Ct. App. 1988) (concluding that a liability policy issued to a daycare provider for her business provided primary coverage for an injury to a child in the daycare over the daycare provider's homeowner's policy because the liability policy specifically described the type of risk involved).

We turn then to application of the "total policy insuring intent" analysis, which focuses on the primary risks and functions of each policy. Our review of each policy under this analysis convinces us that the loss here should be shared pro rata. Both policies provide general liability coverage rather than coverage for a specific risk or instrumentality. Cf. Redeemer Covenant Church of Brooklyn Park v. Church Mut. Ins. Co., 567 N.W.2d 71, 80-81 (Minn. Ct. App. 1997) (holding that a professional liability policy provided primary coverage over a general liability policy for acts committed by a pastor during counseling sessions); Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co., 433 N.W.2d 82, 86 (Minn. 1988) (holding that a school's excess policy was primary over a student's homeowner's policy for injuries to the student during physical education class). The primary risks contemplated by the USF&G policy are broad, covering all of Payless's stores nationwide for any liability Payless incurs related to its business of supplying building supplies. The risk that a subcontractor will get injured installing displays for the building supplies is

contemplated by that policy, though it is by no means expressly contemplated. CU's policy provides general liability coverage to KamCo for liability arising from KamCo's operations of providing hanging display services, including providing coverage to additional insureds for which KamCo provides these services. We believe that each policy provides broad coverage, and each policy equally contemplated the loss at issue here.

Having decided that each policy provides pro rata coverage, we must address the issue of the first $200,000 of liability, as Payless's policy with USF&G contains a self-insured retention of that amount applicable to this claim. The district court concluded that Payless was self-insured for that amount, and that the self-insurance was "other insurance" within the meaning of CU's "other insurance" clause, such that Payless's self-insurance was primary over CU's excess coverage for the first $200,000 for which USF&G is not liable. Although Minnesota courts have found certificates of self-insurance[4] to constitute "insurance" in the context of automobile insurance and compulsory liability insurance statutes, see McClain v. Begley, 465 N.W.2d 680, 682 (Minn. 1991) (holding that "[t]he certificate [of self-insurance] filed with the commissioner is the functional equivalent of an insurance policy" for purposes of Minnesota's no-fault statutes, Minn. Stat. § 65B.49, subd. 3(1) (2002)), we do not believe that those cases dictate a finding that Payless's SIR under its USF&G policy is "other insurance" for purposes of allocating coverage for Payless's liability. The self-insurance involved in those cases was approved by the Minnesota legislature as an alternative to statutorily-mandated automobile insurance coverage. The plan of self-insurance must meet statutory requirements before it is approved and a certificate is issued. See Minn. Stat. § 65B.48, subd. 1 (2002) (requiring every automobile owner to maintain "a plan of reparation security under provisions approved by the commissioner"); § 65B.48, subd. 3 (listing requirements for self-insurance); § 65B.43,

---

[4]CU does not contend that Payless has a "certificate of self-insurance" issued by the Minnesota Department of Commerce.

subd. 9 (defining "Reparation obligor" as "an insurer or self-insurer obligated to provide the benefits required by [Minnesota's No-Fault Automobile Insurance Act]" (emphasis added)); Hertz Corp. v. State Farm Mut. Ins. Co., 573 N.W.2d 686, 688 (Minn. 1998) (noting that Minnesota's no-fault automobile statute requires a self-insurer to obtain authorization from the commissioner of commerce to operate as a self-insurer). Self-insurance in that context is statutorily-defined to equate to insurance only because the Minnesota legislature has decided to allow entities to meet their statutory obligation to provide no-fault automobile insurance with self-insurance if specific requirements are met. No Minnesota case suggests that self-insurance is the equivalent of insurance outside the context of no-fault legislation.

"The interpretation of an insurance contract is a question of law as applied to the facts presented. . . . When insurance policy language is clear and unambiguous, 'the language used must be given its usual and accepted meaning.'" State Farm Mut. Auto. Ins. Co. v. Tenn. Farmers Mut. Ins. Co., 645 N.W.2d 169, 175 (Minn. Ct. App. 2002) (internal citations omitted). The term "insurance" generally does not include a SIR under an insurance policy. Compare Black's Law Dictionary 814 (8th ed. 2004) (defining "insurance" as "[a] contract by which one party (the insurer) undertakes to indemnify another party (the insured) against risk of loss, damage, or liability arising from the occurrence of some specified contingency") with Black's Law Dictionary 1391 (8th ed. 2004) (defining "self-insured retention" as "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usually must be paid before the insurer will pay benefits"). "A majority of jurisdictions across the nation subscribe to the . . . view of self-insurance as 'not insurance' in, inter alia, an 'other insurance' context." Consolidated Edison Co. of N.Y., Inc. v. Liberty Mut., 749 N.Y.S.2d 402, 404 (N.Y. Sup. Ct. 2002) (collecting cases). If CU intended its "other insurance" clause to apply to self-insurance or self-insured retentions included within other insurance policies, it could have so stated in its "other insurance" clause, but it did not. Cf. Redeemer Covenant Church of Brooklyn Park, 567 N.W.2d at 79 (construing policy that stated that its coverage was "excess over and above any other

valid and collectible insurance (including any deductible portion) or agreement of indemnity, available to the insured" (emphasis added)); Nabisco, Inc. v Transp. Indem. Co., 192 Cal. Rptr. 207, 208-09 (Cal. Ct. App. 1983) (finding self-insurance to be "other insurance" where policy explicitly stated that its coverage was excess if there was "other insurance or self-insurance" (emphasis added)).

The SIR in this case is nothing more than a large deductible. Payless did not hold itself out to the world as a self-insurer but merely contracted with USF&G for a reduced premium by agreeing to a larger SIR. If Payless had no insurance at all it could be said to be "self-insured" in that it would be responsible for its own liability. CU does not purport that in that circumstance Payless's actual uninsured but allegedly "self-insured" status would be "other insurance" within the meaning of its "other insurance" clause. Rather, CU would be liable for the full amount of Payless's liability as the only insurer. In fact, during oral argument, CU's counsel agreed that if we determined that CU provided primary coverage and USF&G provided excess coverage, then the $200,000 SIR was no longer at issue. If the SIR truly was self-insurance as CU wants to define that term, then the SIR would arguably be primary regardless of what we determined USF&G's coverage to be. CU's concession cements our conclusion that the SIR is nothing more than a deductible contracted between Payless and USF&G. Because the SIR contained in the USF&G policy is not "other insurance" within the meaning of CU's "other insurance" clause, CU's policy provides the only insurance coverage for the first $200,000 of Payless's liability (subject of course to the $10,000 SIR in CU's own policy). See Cargill, Inc., 889 F.2d at 180 (applying Minnesota law and holding that, up to the higher deductible contained in one of two applicable insurance policies, only one insurance policy provided coverage so that its "other insurance" clause was not triggered); cf. Wallace v. Tri-State Ins. Co. of Minn., 302 N.W.2d 337, 340-41 (Minn. 1980) (holding that the excess carrier was liable only for the insured's deductible, which was not covered by the primary insurer).

The district court determined that CU was not obligated to pay any defense costs because USF&G provided primary coverage and CU's excess policy was never required to contribute toward the settlement, as the settlement was less than USF&G's policy limits. CU's policy included a "duty to defend any claim or 'suit' seeking damages to which this insurance applies, but only with respect to damages . . . [n]ot covered by 'underlying insurance' or by any other valid and collectible insurance." (Appellants' App. at 168.) Having determined that CU's insurance applies to the underlying lawsuit and that a portion of the damages from the lawsuit are "[n]ot covered by any other valid and collectible insurance," we leave to the district court to address issues of defense costs in the first instance on remand.[5]

III.

We hold that because the self-insured retention under the USF&G policy is not "other insurance," Commercial Union's policy provides coverage for the first $200,000 of Payless's liability, and further, that the policies equally contemplated the risk. Accordingly, the insurers should pro rate the balance of the settlement. The district court's judgment granting summary judgment in favor of Commercial Union is reversed, and the case is remanded to the district court for further proceedings not inconsistent with this opinion.

______________________________

[5]Given the intricacies involved with Payless's bankruptcy and the lack of a developed appellate record on the issue, we also leave to the district court to address on remand CU's argument that Payless is not entitled to recoup $200,000 from CU because Payless tendered stock in lieu of cash in the settlement of its $200,000 obligation. (See Appellees' Br. at 23-24.)

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**
THOMAS F. EAGLETON COURT HOUSE
ROOM 24.329
111 S. 10TH STREET
ST. LOUIS, MISSOURI 63102

MICHAEL E. GANS
Clerk of Court

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

December 29, 2005

RECEIVED BY MAIL
JAN 0 2006
CLERK US DIST COURT MINNEAPOLIS MN

Mr. Richard Sletten
Clerk
U.S. DISTRICT COURT, MINNESOTA
202 U.S. Courthouse
300 S. Fourth Street
Minneapolis, MN 55415

Re: 04-1826 USF&G Ins. Co. vs. Commercial Union

Dear Clerk:

The mandate of this Court is being sent to the clerk of the district court, together with a receipt. The clerk of the district court is requested to sign, date, and return the receipt to this office.

Any district court records in this court's possession will be returned shortly.

(5175-010199)

Sincerely,

Michael E. Gans

Michael E. Gans
Clerk of Court

srd

Enclosure

(LETTER FOR INFORMATIONAL PURPOSES ONLY)

---

cc: Honorable Michael J. Davis
Jeannie M. Provo-Petersen
Gregory John Johnson
Klay Ahrens
Douglas R. Archibald
Megan D. Hafner

District Court/Agency Case Number(s): CIV 01-399 MJD/JGL